[NOT FOR PUBLICATION]                          [Doc. No. 35]

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

---

JANE E. BENTLEY,

               Plaintiff,

     v.

ATLANTIC COUNTY, NEW JERSEY,
et al.,

               Defendants.

Civil No. 05-2942 (RMB)

**OPINION**

---

Appearances:
    Robyn Michelle Aghen
    Dessen Moses & Rossitto
    1415 Route 70 East
    Suite 614
    Cherry Hill, NJ 08034
        Attorney for Plaintiff Jane E. Bentley.

    Timothy M. Crammer
    Crammer, Bishop, Marczyk & O'Brien, PC
    508 New Jersey Ave
    Suite B3
    Absecon, NJ 08201

    David J. Bishop
    Crammer, Bishop, Marczyk & O'Brien, PC
    508 New Jersey Ave
    Suite B3
    Absecon, NJ 08201
        Attorneys for Defendants Atlantic County, James
    McGettigan, and Joseph C. Connelly.

**BUMB,** United States District Judge:

    This matter comes before the Court upon Defendants' motion

1

Dockets.Justia.com

for summary judgment.  Plaintiff, Jane E. Bentley, an Atlantic
County Sheriff's officer filed a five count Complaint alleging
Constitutional, statutory, and state law claims against
Defendants Atlantic County, County Sheriff James McGettigan, and
Under Sheriff Joseph Connelly, stemming from her suspension from
work.  Defendants assert various grounds for summary judgment
which will be discussed in turn below.


I.   Statement of Facts

     The following facts are derived from the undisputed record
and viewed in a light most favorable to the Plaintiff as the non-
moving party.  Where adequately supported factual disputes exist,
Plaintiff's version is accepted.

     Plaintiff, Jane E. Bentley, began employment as a sheriff's
officer with the Atlantic County Sheriff's Department in 1981.
The County Sheriff, Defendant James McGettigan, was elected to
that post in 1993.  McGettigan appointed Defendant James Connelly
Under Sheriff in 1994.  The Sheriff's Office had assigned
Plaintiff to duty at the Atlantic City Civil Courthouse
throughout her career.  Plaintiff's career has not been without
incident, and therein lies the heart of this case and the instant
motion.

     Bentley provides the Court with a detailed account of
several different incidents involving Bentley that took place

2

between October of 1997 and October 2003.  In the first incident Bentley received an oral reprimand for allegedly and improperly giving legal advice to individuals in the courthouse.  Bentley, through counsel, filed a grievance of that action but nothing came of it.

In a second incident Bentley allegedly had a confrontation with a civilian employee of the court.  That resulted in a meeting between Bentley, Connelly, Internal Affairs Department Investigator L. Pete Bacon, a union representative, and Bentley's immediate supervisor.  At that time they asked Bentley of any personal problems and offered help but Bentley denied having problems or needing help.

A third incident involved allegations that Bentley had a confrontation with another court employee.  Bacon investigated the incident and produced two reports.  One report summarized the incident and the parties' version of events.  A second report, marked "Confidential," noted that Bentley had "her usual bad attitude during the interview," and that Bentley felt she was being singled out and treated unfairly.  (Pl.'s Opp. at 6). Bacon recommended "a one (1) day suspension, or a psychological re-test or anger management/sensitivity training classes." (Id. at 7).  The Sheriff's Office suspended Bentley for one day.

Bentley then had a second confrontation with this same employee.  This time it was reported to Connelly by one of

3

Bentley's supervisors that Bentley was paranoid and could not "let things go." Connelly held a meeting with Bentley and her union representative, among others, and ordered her to undergo a psychological fitness for duty exam. Connelly later rescinded this order after Bentley's counsel intervened. Bentley also filed a grievance of her one day suspension for the first confrontation with this employee. The suspension was reversed after a hearing where an arbitrator concluded that, based in part on Bacon's "Confidential" report, Bacon conducted a deficient investigation and lacked impartiality.

Against this background arose the final incident that led to Bentley's suspension without pay and this lawsuit. On October 28, 2003, Bentley allegedly made inappropriate comments in the presence of a juvenile whom the sheriff's officers were processing after arresting her and her mother for an altercation in the courthouse. Allegedly Bentley made a statement to her fellow sheriff's officers to the effect of, "who were the nine officers who beat up the lady [who had been arrested]."

On November 5, 2003, Connelly again met with Bentley and her union representative and asked her to produce a written report of this incident. Immediately prior to Bentley returning with the report Connelly told Sheriff's officer Stephen Caldwell that he intended to suspend Bentley and was afraid of what her reaction would be. Connelly told Caldwell to take her from the room and

ask for her weapon as soon as Connelly told her of the suspension. Bentley returned the report, Connelly told her of the suspension, and Bentley surrendered her weapon to Caldwell. Bentley's report claimed that she did not recall making the comment but she later admitted that she had made the statement. After the meeting Connelly gave Caldwell a written report of the meeting and instructed him to produce his own report that mirrored Connelly's. The next day, the Sheriff's Office formally suspended Bentley with pay and ordered her to undergo a psychological fitness for duty examination.

Dr. Guillermo Gallegos conducted the fitness for duty examination of Bentley on November 12, 2003. Gallegos concluded that Bentley was unfit for duty and should complete a neuropsychological evaluation and undergo six months of psychotherapy. On December 1, 2003, McGettigan ordered Bentley to comply with Gallegos' recommendation and suspended Bentley without pay effective December 2, 2003. On that day, Bentley received a Preliminary Notice of Disciplinary Action ("PNDA") for violations of the rules and regulations of the Sheriff's Office on October 28, 2003.

Previously, on November 5, 2003, Bentley had filed a grievance seeking arbitration of the decision to suspend her with pay. The record is unclear of the precise order of events in the grievance procedure but it is undisputed that this did not

produce a result favorable to Bentley.  As a result, on November 12, 2004, Bentley appealed what was now a suspension without pay to the New Jersey Department of Personnel's Merit Board.  The Board ruled, on July 28, 2005, that Bentley had to comply with Gallegos' recommendation otherwise the County could begin proceedings to terminate her.  Bentley did not comply and, on September 29, 2005, she received a new PNDA that sought her termination based on charges arising from the numerous incidents discussed above as well as the October 28 incident.  That notice allowed Bentley to request a hearing on the charges, which Bentley did through counsel.  But Bentley's counsel later requested the hearing be postponed indefinitely.  To date, Bentley has not sought a new hearing date and remains suspended without pay.

Prior to the Board's ruling, the issuance of the last PNDA, and before Bentley made her most recent hearing request, Bentley filed a five count Complaint, on July 9, 2005, in this Court against Defendants McGettigan, Connelly, and Atlantic County. Defendants now request summary judgment.

II.  Standard

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law."[1]  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

III. Analysis

    Bentley's Complaint alleges three civil rights claims and two state law discrimination claims.  Count 1 asserts, under 42 U.S.C. § 1983, a claim for violation of Plaintiff's right to procedural due process.  Bentley's principal complaint concerns

---

    [1]    The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

the "legality of her suspension."[2]  (Pl.'s Opp. at 15).

Defendants now move for summary judgment on this claim.

The Constitution provides a right against State deprivations "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  Violations are actionable under 42 U.S.C. § 1983, which provides a cause of action against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights . . . secured by the Constitution . . . ."  A claim under § 1983 for a deprivation of procedural due process requires a showing by the plaintiff of both a protected property interest and a deprivation of that interest without due process.  Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).  A protected property interest is one in which the plaintiff had a legitimate entitlement to continued enjoyment of that interest.  Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).  Due process requires, at minimum, notice and hearing.  Wilson v. MVM, Inc., 475 F.3d 166, 178 (3d Cir. 2007).  A violation of the right to due process occurs not at the time the individual is deprived of a property interest but at the time it becomes apparent that the minimum

---

[2]     Plaintiff's Complaint actually alleges a lack of "opportunity to challenge Sheriff McGettigan's decision that she was unfit for duty prior to being suspended" and a lack of opportunity to challenge her suspension.  (Compl. at ¶ 44).  She has since disavowed a claim based on the decision that she was unfit for duty.  (See Pl.'s Opp. at 14-15).

level of process will not be afforded.  <u>Zinermon v. Burch</u>, 494
U.S. 113, 126 (1990).  The timing, manner, and type of notice
required is dependent on a balance of: the private interest at
stake; the risk of error in the procedure used compared with the
accuracy of alternative or additional procedures; and, the
government's interest.  <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976).

    Here, Bentley has a protected property interest in remaining
an active Sheriff's Officer.  The Third Circuit has recognized a
protected property interest in state employment where the
employment agreement contains a "for-cause" termination
provision, <u>Linan-Faye Construction Co. v. Housing Authority</u>, 49
F.3d 915, 932 (3d Cir. 1995), found in many civil service laws
including New Jersey's, <u>see, e.g.</u>, N.J. Admin. Code § 4A:2-2.5.
By extension, where state employment may be suspended only "for-
cause" a similar protected property interest lies.  <u>Id.</u>; <u>see
also</u>, <u>Gniotek v. City of Philadelphia</u>, 808 F.2d 241, 235 n.5 (3d
Cir. 1986).

    Such a clause applies to Bentley's employment.  The New
Jersey Administrative Code provides that an employee must receive
a notice and a hearing prior to any "major discipline."  N.J.
Admin. Code § 4A:2-2.5(a).  The code provision implicitly
recognizes a suspension as major discipline because it continues:
"except: [a]n employee may be suspended immediately and prior to
a hearing where it is determined that the employee is unfit for

duty . . . ."  N.J. Admin. Code § 4A:2-2.5(a)(1).  If an employee
is deemed unfit for duty a Preliminary Notice of Discipline
("PND") must be issued within five days.  <u>Id.</u>  When a suspension
is immediate and without pay, "the employee must first be
apprised either orally or in writing, of why an immediate
suspension is sought, the charges and general evidence in support
of the charges and provided with sufficient opportunity to review
the charges . . . ."  N.J. Admin. Code § 4A:2-2.5(b).

Here, Bentley was suspended with pay on November 5, 2005,
when Connelly felt that she was unfit for duty.  The Sheriff's
Office ordered Bentley to undergo a fitness for duty examination,
which took place on November 12, 2003.  Dr. Gallegos concluded
that Bentley was unfit for duty and should undergo six months of
therapy.  On December 1, 2003, the Sheriff's Office ordered
Bentley to undergo the recommended therapy and suspended her
without pay effective December 2.  The record reflects that a PND
or PNDA was not issued within five days of the initial suspension
with pay and that Bentley was not informed of the charges and
evidence prior to being suspended without pay, in contravention
of code section 4A:2-2.5.  The record in Bentley's favor
demonstrates that the Sheriff's Office did not follow the proper
procedures in connection with Bentley's suspension.

The question presented in Bentley's claim, however, is not
whether the County complied with the civil service code.

Bentley's claim concerns whether the County afforded Bentley the minimum amount of due process required by the Constitution. Bentley filed a grievance of her suspension, which was eventually heard and ruled upon.  The ruling required Bentley to comply with the instruction to receive therapy, and required the County to then either end the suspension or bring disciplinary charges. Bentley did not comply and the Sheriff's Office filed disciplinary charges on September 29, 2005.  Hearings were schedule on those charges but postponed indefinitely at Bentley's request.  Accordingly, Bentley's suspension has remained in effect because Bentley has not completed the administrative review process.

It is evident now that Bentley's claim of deprivation of procedural due process is premature.  A plaintiff complaining of a lack of due process must first take "advantage of the processes that are available to h[er], unless those processes are unavailable or patently inadequate." Alvin, 227 F.3d at 116. "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." Id. Bentley does not argue that the process is unavailable or patently inadequate; the record demonstrates that the process was available and working for Bentley until she chose to delay it. Bentley seeks to use the federal courts to resolve the dispute

over her suspension prior to completing the process available to
her.  A procedural due process violation does not occur when the
plaintiff does not take advantage of the seemingly adequate
process available.  Id.  A claim of a deprivation of due process
requires first and foremost a lack of process.  Accordingly,
because Plaintiff has not exhausted the processes available to
her, her complaint of a lack of due process is premature.
Zinermon, 494 U.S. at 126.  Defendants are entitled to judgment
on Plaintiff's procedural due process claim.

Defendants also seek summary judgment on Plaintiff's 42
U.S.C. § 1983 claim, Count 3.  Bentley's third count asserts a
claim, under 42 U.S.C. § 1983, for violation of the Equal
Protection Clause of the Fourteenth Amendment.  The Equal
Protection Clause prohibits, among other things, state officials
from intentionally discriminating on the basis of race or gender.
J.E.B. v. Alabama, 511 U.S. 127, 146 (1994).  The Court notes
that Plaintiff's claim in Count 3 is strictly and explicitly only
a claim for violation of the Equal Protection Clause.  (See
Compl. Ct. 3).  Yet, inexplicably, both Defendants and Plaintiff
rely on arguments and authorities applicable to claims under
Title VII, 42 U.S.C. § 2000c - et seq., and not the Equal
Protection Clause.  The parties rely on law pertinent to Title
VII that make it an unlawful employment practice to discriminate
on the basis of race.  Id.  In that sense, the claim Plaintiff

12

asserts and a Title VII claim are similar.[3]  Plaintiff alleges
that because of her race and gender McGettigan and Connelly
intentionally discriminated against her in the manner of the
investigations into the alleged infractions and, in regard to the
sanctions imposed for those infractions.

    To establish a § 1983 claim for a violation of Plaintiff's
right to equal protection, Plaintiff must show Defendants
intentionally discriminated against the Plaintiff because she is
African-American or a woman.  Cf. Antonelli v. New Jersey, 419
F.3d 267, 273-74 (3d Cir. 2005); see also Baker v. Monroe Twp.,
50 F.3d 1186, 1190-91 (3d Cir. 1995) (stating that in order to be
personally liable a defendant must have participated in a
violation of one's constitutional rights).  "Discriminatory
intent implies that the decision-maker . . . selected or
reaffirmed a particular course of action at least in part
'because of,' not merely 'in spite of,'" Plaintiff's race or
gender.  Antonelli, 419 F.3d at 274 (quoting Personnel Adm'r of
Mass. v. Feeney, 442 U.S. 256, 279 (1979)).

    Plaintiff alleges that Defendants had a "scheme . . . to put
Bentley out of work" because of her race and gender.  (Pl.'s Opp.

---

    [3]    Important differences exist, however.  For example, the
two claims differ in their jurisdictional requirements.  A claim
under Title VII has jurisdictional prerequisites, such as
exhaustion of administrative remedies, see 42 U.S.C. 42 § 2000e-
5, that Plaintiff has not met.  No such prerequisites exist for
Plaintiff's equal protection claim.

at 20).  The scheme involved conducting investigations into
alleged rule infractions differently than investigations of white
male officers, and meting out punishments different than those
given white male officers.  In sum, Plaintiff offers that the
evidence will show that

> the Defendants manufactured . . . a 'serious incident'
> requiring the personal attention of Col[onel] Connelly,
> [Defendants] scripted the . . . meeting with Col[onel]
> Connelly to justify Bentley's immediate suspension, and
> finally arranged to have Dr. Gallegos conduct a sham
> evaluation to support a completely baseless
> recommendation that Bentley undergo . . .
> psychotherapy.

(Pl.'s Supp. Opp. [Doc. 48] at 9).  This summation omits
reference to the alleged discriminatory investigations.

Plaintiff's claim is allegation and argument, but not
evidence.  Plaintiff concedes that there is no direct evidence of
discriminatory intent and, instead, argues that there is
circumstantial evidence.  First, the claim that Defendants
investigated Bentley differently is based on her allegation of
Investigator Bacon's bias and deficient investigations.
Bentley's Supplemental Opposition details several investigations
by Bacon that proceeded "differently" than the investigations of
Bentley.  Bentley alleges these investigations were different
because in none of them did Bacon assess the credibility of the
witnesses or produce a second summary memo, as he did in one of

14

his investigations of Bentley.[4]

However, these allegations, even assuming their truth, do not support a reasonable inference that Bacon discriminated against Bentley based on her race or gender.  The fact that Bacon did not assess a witness' credibility in other investigations, as Bentley claims he did in his investigations of her, is subject to diverse explanations unique to each particular investigation.  Without evidence or appropriate analysis it is too great a leap to make the inference that Bacon assessed a witness' credibility here because of Bentley's race or gender.[5]  The same is true with respect to his production of the second summary memo.  Discriminatory intent implies that the wrongdoer selected a particular course of conduct "'because of,' not merely, 'in spite of,' its adverse effects upon an identifiable group."  Antonelli, 419 F.3d at 274.  These allegations, without supporting evidence,

---

[4]    These documents were provided to Bentley pursuant to a Consent Protective Order, [Doc. No. 43], that limited access to the files to Bentley's counsel, and a limited few others under Bentley's counsel's supervision.  In her filing, Bentley only describes the contents of these investigations and has not submitted them as part of the record.  Accordingly, the contents of the files remain only allegation and are insufficient to avoid summary judgment.  Liberty Lobby, Inc., 477 U.S. at 248 (1986).

[5]    This shortcoming is not excused by the Protective Order.  Bentley's counsel could have filed the documents under seal, which would have been consistent with the limits of the Protective Order.  In the alternative, Bentley should have moved for a modification of the Protective Order.  Notwithstanding this, the files' contents, even as alleged by Bentley, would be insufficient to defeat Defendants' motion for summary judgment for the reasons the Court discusses below.

do not survive summary judgment.

Bentley's other allegation is that the suspension and order to undergo a fitness for duty examination was a punishment greater than that given to white male Sheriff's Officers for similar infractions.  On November 5, 2003, Connelly met with Bentley about the October 28, 2003 incident.  Connelly told Bentley to write her version of events and return it to Connelly. When Bentley finished, Connelly ordered her to undergo a fitness for duty examination and suspended her with pay until she did so. A few months earlier, on August 27, 2003, Connelley had also ordered Bentley to undergo an exam after a probation officer complained about two instances where Bentley was rude to her. Connelly rescinded that order to Bentley later that day.  These decisions were based on reports by Plaintiff's co-workers that she "could not let go of the past and that her paranoia, if left unchecked, would only escalate."  (Pl.'s Opp. at 7).

The Plaintiff lacks evidence of any kind that Connelley decided to send Bentley for an exam or to suspend her because of her race or gender.  Bentley seeks to rely on the other investigations as evidence that white male officers were not ordered to undergo psychological exams in response to complaints made against them.  Yet the files do not indicate that all the other investigated officers were white males.  Further, none of the other allegations investigated are factually similar to the

16

incident that precipitated Bentley's suspension.  The undisputed evidence indicates that Bentley was the subject of numerous complaints by members of the courthouse staff and that Connelly had previously questioned Bentley's psychological fitness for duty.  It would be pure speculation, not a reasonable inference, to conclude that simply because other officers were not suspended or ordered to take an exam that Connelly's order was motivated by race or gender bias.  There is no other evidence that Connelly's decision was motivated, even in part, because of Bentley's race and gender.  Accordingly Defendants are entitled to judgment on Bentley's equal protection clause claim.

In the alternative, Defendants argue that they are entitled to qualified immunity on Plaintiff's claim.  Under this analysis the result is the same.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  It calls for a multi-step analysis, considered in proper sequence.  Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Court must first determine if the facts, taken in the light most favorable to the injured party, show a constitutional violation.  Id. at 201.  The second inquiry concerns whether there was a reasonable mistake of fact or law.  Butz v. Economou, 438 U.S. 478, 507 (1978).  The latter concerns whether the right clearly was established such that an objectively reasonable officer could not be mistaken that his

17

conduct violated that right.  <u>Saucier</u>, 533 U.S. at 205-06.  The former concerns whether an officer made a reasonable mistake of fact.  <u>Butz</u>, 438 U.S. at 507; <u>see also</u>, <u>Couden v. Duffy</u>, 446 F.3d 483, 502 (3d Cir. 2006) (Weiss, J., dissenting).

Here, the facts viewed in the light most favorable to Plaintiff fail to establish a constitutional violation.  As discussed, Bentley does not establish a violation of her right to due process because she has not taken advantage of the process that is available to her.  Second, Bentley has not established a violation of her right to equal protection because she has no evidence of intentional discrimination on the part of the Defendants.  Accordingly, Defendants would also be entitled to qualified immunity on the same grounds they are entitled to summary judgment.

Defendants also attack the validity of Plaintiff's state law claim.  Count 4 alleges a violation of New Jersey's Law Against Discrimination ("LAD"), N.J. Stat. Ann. § 10:5-1 - <u>et seq.</u>  The LAD provides that it is unlawful "[f]or an employer, because of the race . . . [or] gender . . . of any individual . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . ." N.J. Stat. Ann. § 10:5-12(a).  A LAD claim of discriminatory treatment may advance on direct or circumstantial evidence.  Where the plaintiff relies on circumstantial evidence New Jersey's courts have applied the

18

McDonnell-Douglas framework applicable to Title VII claims.

Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 82 (1978)

(citing McDonnell Douglas Corp,. v. Green, 411 U.S. 732 (1973)).

McDonnell-Douglas employees a three-step analysis.  First,

plaintiff must establish a prima facie case that permits an

inference of discriminatory intent on the part of the defendants.

Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Provided the plaintiff succeeds at this, the second step requires

defendants to proffer "a legitimate, nondiscriminatory reason"

for their actions.  Id.  Should defendants do so, the third and

final step requires a plaintiff to produce enough evidence to

permit a reasonable jury to conclude that the proffered reason is

mere pretext.  St. Mary's Honor Ctr v. Hicks, 509 U.S. 502, 506

(1993).

     Here, this Court has already noted that Plaintiff has failed

to produce enough evidence that a reasonable jury could conclude

that Defendants acted on the basis of Plaintiff's race and

gender.  Even accepting as evidence Plaintiff's assertions as to

the contents of the Internal Affairs files, those files do not

support a reasonable inference of discriminatory intent on the

part of Defendants McGettigan and Connelly.  It is mere

speculation that might only survive a motion to dismiss.  See

Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965, 167 L. Ed.

2d 929 (2007).  Further, assuming arguendo that Plaintiff

established a prima facie case, Defendants meet their burden with evidence that the decision to suspend Bentley and order a pyschological exam was the result of the numerous confrontations and issues Bentley had at work. Those incidents are undisputed and detailed at length by Bentley. Gallegos' finding that Bentley was unfit for duty further validates Defendants' determination and Bentley has no evidence to support the fantastical allegation that Gallegos was part of the conspiracy to discriminate against her. This shifts the burden back to Bentley to show pretext. Again, Bentley has no evidence to refute the reasonable explanation proffered by Defendants, and validated by Gallegos'. Accordingly, Defendants are entitled to summary judgment on Plaintiff's LAD claim.

Defendants also seek judgment on behalf of the County arguing that the County cannot be vicariously liable for Plaintiff's 42 U.S.C. § 1983 claims against McGettigan and Connelly. Because the Court finds that Defendants are entitled to judgment on Plaintiff's § 1983 claim, this argument need not be considered further.

Finally, although Defendants conclude that Bentley's Complaint should be dismissed they have not addressed Count 2, which asserts a claim under 42 U.S.C. § 1981, or Count 5, which asserts a claim under the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2. Accordingly, the Court will neither address nor

dismiss these Counts.

IV.  Conclusion

     For the reasons discussed above, Defendants' motion for summary judgment is granted.  Defendants are granted summary judgment on Count 1, the Due Process claim, Count 3, the Equal Protection Claim under 42 U.S.C. § 1983, and Count 4, the New Jersey LAD claim.  An appropriate Order shall issue this date.

Dated:  August 16, 2007              s/Renée Marie Bumb
                                     RENÉE MARIE BUMB
                                     United States District Judge

21